**2024-2167**

# United States Court of Appeals for the Federal Circuit

**LIFE SPINE, INC.,**
*Appellant*

*v.*

**GLOBUS MEDICAL, INC.,**
*Appellee*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2022-01434

## RESPONSIVE BRIEF OF APPELLEE

Stephen D. Zinda
James H. Hall
Tel: 832-631-9992
Fax: 832-631-9991
Stephen@CHZFirm.com
James@CHZFirm.com
CABELLO HALL ZINDA, PLLC
801 Travis Street, Suite 1610
Houston, TX 77002

*Counsel for Appellee Globus Medical, Inc.*

## PATENT CLAIM AT ISSUE

Claim 10 of U.S. Patent No. 8,845,731 recites:

10. An intervertebral implant comprising:

a first endplate comprising an upper side, a lower side, a ramped surface, the ramped surface extending from the lower side, wherein the first endplate includes a first side portion, the first side portion including a first ramped portion;

a second endplate comprising an upper side, a lower side, a ramped surface, the ramped surface extending from the lower side, wherein the second endplate includes a second side portion, the second side portion including a second ramped portion, wherein the first ramped portion of the first endplate and the second ramped portion of the second endplate are complementary with one another; and

a central ramp comprising an expansion portion and an extension portion extending from the expansion portion, the expansion portion having a first ramped surface for engagement with the ramped surface of the first endplate and a second ramped surface for engagement with the ramped surface of the second endplate, the extension portion configured with an opening,

a driving ramp comprising an expansion portion and an opening extending though the driving ramp in a longitudinal axis, the expansion portion of the driving ramp configured to engage to the first and second endplates,

an actuator member extending through the opening of the driving ramp and configured to engage with the opening in the extension portion of the central ramp,

wherein when the actuator member is actuated in one direction, the driving ramp is fixed with respect to the actuation member and the central ramp is configured to move in a first direction and cause the first and second endplates to move outwardly and away from one another, and when the actuator member is actuated in a second direction, the central ramp is configured to move in a second direction and causes the first and second endplates to move inwards and towards one another.

Appx169.

## CERTIFICATE OF INTEREST

Counsel for Appellee Globus Medical, Inc. certifies as follows:

1. The full names of every party represented by me is:

Globus Medical, Inc.

2. The name of the real party in interest represented by me is:

None.

3. All parent corporations and publicly held companies that own 10 percent or more of stock in the party represented by me are:

None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

None

5. The pending trial court proceedings that will be directly affected by this Court's decision:

*Globus Medical, Inc. vs. Life Spine, Inc.,* No. 21-cv-01445 (D. Del.)

6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable.

Dated: February 20, 2025

/s/ Stephen D. Zinda
Stephen D. Zinda
Attorney for Appellee

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ iii

STATEMENT OF RELATED CASES ........ v

COUNTER-STATEMENT OF THE ISSUE FOR APPEAL ........ vi

I. INTRODUCTION ........ 1

II. COUNTER-STATEMENT OF THE CASE ........ 3

A. The Parties' IPR Positions ........ 3

B. The Final Written Decision ........ 19

C. Request for Director Review ........ 27

D. Appeal ........ 27

III. SUMMARY OF THE ARGUMENT ........ 28

IV. THE BOARD CORRECTLY CONSTRUED "COMPLEMENTARY WITH ONE ANOTHER" ........ 32

A. The Board Properly Consulted the Dictionary Definition, which is Consistent with the Usage in the Claim, Specification and Prior Art. ........ 32

B. All Credible Evidence Demonstrates "Complementary" is Used in Accordance with its Common Meaning In the Field of Spinal Implants ........ 38

C. Life Spine's Disregard of the Use of "Complementary" in the Specification Should be Rejected. ........ 45

D. The Board's Construction Does Not Exclude Preferred Embodiments ........ 47

E. There is Nothing "Vague" About the Board's Construction. ........ 53

F. Life Spine Mischaracterizes the Prosecution History and Law. ........ 55

V. CONCLUSION ........ 67

# TABLE OF AUTHORITIES

***Cases***

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
457 F.3d 1293, (Fed. Cir. 2006) .......... 35

*Anderson v. Int'l Engineering & Manufacturing, Inc.*,
160 F.3d 1345 (Fed. Cir. 1998) .......... 38, 39

*3M Co. v. Evergreen Adhesives, Inc.*,
860 F. App'x 724 (Fed. Cir. 2021) .......... 46

*Comaper Corp. v. Antec, Inc.*,
596 F.3d 1343 (Fed. Cir. 2010) .......... 36

*Convolve, Inc. v. Compaq Comput. Corp.*,
812 F.3d 1313 (Fed. Cir. 2016) .......... 62

*Cordis Corp. v. Medtronic AVE, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003) .......... 66-69

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
527 F.3d 1379, 1382 (Fed. Cir. 2008) .......... 24

*Google LLC v. Network-1 Techs., Inc.*,
726 F App'x 779 (Fed. Cir. 2018) .......... 43

*Imaginal Systematic, LLC v. Leggett & Platt, Inc.*
805 F.3d 1102 (Fed. Cir. 2015) .......... 36-37

*In re Power Integrations, Inc.*,
884 F.3d 1370 (Fed. Cir. 2018) .......... 35

*Lynk Labs, Inc. v. Samsung Elecs. Co.*,
125 F.4th 1120 (Fed. Cir. 2025) .......... 43

*Netflix, Inc. v. DivX, LLC*,
84 F.4th 1371 (Fed. Cir. 2023) .......... 50, 55, 58

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......... *passim*

*Renishaw PLC v. Marposs Societa' Per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) .......... 39

*Starhome GmbH v. AT&T Mobility LLC*,
743 F.3d 849 (Fed. Cir. 2014) .......... 37

*Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*,
806 F.3d 1356 (Fed. Cir. 2015) .......... 63

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) .......... 39

*TorPharm, Inc. v. Ranbaxy Pharms., Inc.*,
336 F.3d 1322 (Fed. Cir. 2003) .......... 27, 65-66

*V-Formation, Inc. v. Benetton Grp. SpA*,
401 F.3d 1307 (Fed. Cir. 2005) .......... 42-43

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576, 1584 (Fed. Cir. 1996) .......... 42-43

**Other Authorities**

37 C.F.R. § 42.100 .......... 15

## STATEMENT OF RELATED CASES

Appellee Globus Medical, Inc. ("Globus") identifies the following case involving U.S. Patent No. 8,845,731 ("the '731 patent") that may directly affect or be directly affected by a decision in this appeal: *Globus Medical, Inc. v. Life Spine, Inc*., 21-1445 (JPM) (D. Del.), filed on October 13, 2021. There have been no prior appeals.

## COUNTER-STATEMENT OF THE ISSUE FOR APPEAL

Did the U.S. Patent Trial and Appeal Board ("Board") properly construe "complementary with one another" to mean "completing one another," where: (1) the specification *exclusively* uses "complementary" to refer to structures that complete one another; (2) during prosecution the patentee explicitly distinguished "complementary" ramped portions from the prior art on the basis that the prior art ramped portions do not complete one another; (3) the common meaning of "complementary" is "completing" as evidenced by a general-purpose dictionary; (4) the spinal implant prior art *only* uses "complementary" consistent with the common meaning; and (5) the only purported support for the assertion that "complementary" has a different meaning is the Examiner's objectively unreasonable application of the term to the prior art, which the patentee repeatedly stated it was not acquiescing to?

## I. INTRODUCTION

The Board correctly construed "complementary with one another" to have its plain and ordinary meaning "completing one another." The specification exclusively uses the term "complementary" to refer to structures that complete one another—not "ramps with mirrored angles." This is consistent with the common meaning of "complementary," as reflected by the dictionary and usage of the term in the prior art relied on by Life Spine.

The prosecution history further confirms this interpretation. The claims were amended to recite "complementary with one another." The applicant argued that the amendment excluded the mirrored ramps of the cited art, and instead encompassed an embodiment from the specification depicting ramped portions that complete one another. Although the Examiner persisted in applying "complementary with one another" to the prior art unreasonably—i.e., by disassembling prior art implants and rearranging their components in hypothetical, non-functional ways—the Board correctly determined that the Examiner's interpretation "at best" comported with the broadest reasonable interpretation standard (not *Phillips*) and that the applicant expressly stated that it was not acquiescing to that interpretation. Based on the overwhelming intrinsic and extrinsic evidence, "complementary with one another" was properly accorded its plain and ordinary meaning.

In the *inter partes* review petition, Life Spine ignored the specification, the

prior art, and the prosecution amendment and arguments, instead relying *exclusively* on the Examiner's unreasonable application and unsubstantiated expert testimony. Indeed, Life Spine fails to cite any *credible* evidence that anyone else has ever used "complementary" in the manner proposed by Life Spine. Recognizing that its original theory contravenes Federal Circuit claim construction law, Life Spine's appeal resorts to arguments that were never raised to the Board and that are premised on glaring mischaracterizations of the evidence.

Life Spine *now* falsely argues, for example, that the Board's construction is "divorced from the specification," even though the specification only uses the term "complementary" consistent with structures that "complete one another"—not mirrored ramped surfaces. Blue Brief ("BB"), 11.[1] Life Spine also now falsely contends that the amendment adding the "complementary" limitation "excludes the very embodiment" that the applicant pointed to as depicting ramped portions that complete one another, even though the amendment was made to *encompass* that embodiment. *Id.* Life Spine further falsely asserts that the Board ignored "the applicant's complete silence during prosecution," even though the applicant expressly argued that it did *not* consider mirrored ramped surfaces to be "complementary" and repeatedly stated it was *not* acquiescing to the Examiner's

[1] Given that Life Spine's principal brief (ECF No. 18) does not include the page numbers reflected in the table of contents, all citations to the brief are to the ECF stamped numbers at the top of each page.

interpretation. *Id.* Because Life Spine admits that the applicant did not disclaim the plain and ordinary meaning, and because *all* objective evidence demonstrates that the plain and ordinary meaning of "complementary" is "completing," Life Spine's effort to bind Globus to the Examiner's unsupportable interpretation fails.

## II. COUNTER-STATEMENT OF THE CASE

### A. The Parties' IPR Positions

#### *1. Petition*

In its Petition for *Inter Partes Review* ("Petition"), Life Spine alleged that claims 10–14 are invalid based on Korean Reg. Utility Model No. KR20-0290058 ("Chung"), U.S. Patent Application Publication No. US 2008/0140207 ("Olmos") and U.S. Patent Publication 2007/0270968 ("Baynham"). Appx183.

With respect to the "ramped portions" that are "complementary with one another" as recited by independent claim 10, Life Spine argued that "[t]he '731 patent does not explain what makes elements 'complementary with one another.'" Appx225. Life Spine then relied on the Examiner's application of the term during prosecution, arguing that "the Examiner understood, and a POSITA would have understood, the plain and ordinary meaning of this phrase to encompass endplate first and second ramped portions having angles that mirror each other." *Id.* Although Life Spine relied on three paragraphs from the declaration of its expert, Mr. Drewry, he cited no evidence to support his understanding of "complementary" except for

the Examiner's unilateral interpretation. *Id.* (citing Appx941-42 (¶¶ 180-182)).[2] This single paragraph was the extent of Life Spine's claim construction analysis. *Id.*

Based on its broad interpretation, Life Spine alleged that Olmos and Chung expressly disclose a "first ramped portion" and "second ramped portion" that are "complementary with one another" because the ramped portions mirror one another, as shown below:

<table>
<tr><th colspan="2">Life Spine's Mappings to Figure 2 of Chung</th></tr>
<tr><td>
</td><td>
</td></tr>
<tr><th colspan="2">Figure 4 of Chung</th></tr>
<tr><td colspan="2">
</td></tr>
</table>

Appx188, 190, 225-26.

[2] Life Spine represents that its expert is "**Dr.** Troy Drewry." BB26. However, Mr. Drewry does not have a doctorate. *See* Appx832-34 (¶¶ 7-12); Appx2357. Life Spine previously referred to him as "Professor Drewry" or "Prof. Drewry," and the Board referred to him as "Mr. Drewry." Appx183, 185; Appx11.

| Life Spine's Mappings to Figure 18 of Olmos |
| --- |
|  |



Appx282-83. As seen in Figure 4 of Chung and Figure 18 of Olmos above, the identified ramped portions do not complete each other. They are separated by a distal wedge (i.e., element 30 in Chung, element 208 in Olmos) and have mirrored angles of inclination.[3]

*2. Patent Owner's Response*

Globus argued that Petitioner's interpretation was unreasonably broad and inconsistent with the plain and ordinary meaning of "complementary" under *Phillips v. AWH Corp*., 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Appx594. Instead, all credible evidence demonstrated that the plain and ordinary meaning of "complementary with one another" is "completing one another," consistent with its common meaning as evidenced by a general-purpose dictionary. Appx594-95 (citing

[3] Notably, when Life Spine filed its Petition, it was aware based on Globus's infringement contentions that Globus considered ramped portions that are "complementary with one another" to complete one another. Appx600.

Appx2164 (defining "complementary" as "Forming or serving as a complement; completing" and defining "complement" as "Something that completes, makes up a whole, or brings to perfection")).[4]

Turning first to the specification, Globus pointed out that Life Spine and Mr. Drewry were mistaken that "[t]he '731 patent specification itself gives no indication of what is required for elements to be 'complementary with one another." Appx595 (citing Appx941 (¶ 180)). In reference to Figure 17, the specification teaches:

> The upper surfaces 102 of the artificial endplates 100 have at least one spike 106 to engage the adjacent vertebral bodies. The lower surfaces 104 have ***complementary*** texturing or engagement features on their surfaces ***to engage with the texturing or engagement features*** on the upper endplate 14 and the lower endplate 16 of the fusion device 10.

Appx162 (8:36-40) (quoted by Appx595) (emphasis added). Relying on its expert, Mr. Culbert, Globus further explained that a POSITA would understand the complementary texturing or engagement features of lower surface 104 to refer to features that mate with the texture or engagement features of the upper and lower endplate 16, which enhances the quality of the interface between the two (e.g., greater holding strength via intermeshing teeth). Appx595-96 (citing Appx2057 (¶

[4] In its Preliminary Response, Globus argued that "complementary with one another" would be understood to refer to structures that "mate with one another in a beneficial way." Appx410. In the Institution Decision, the Board determined that "in a beneficial way" was subjective, and instead preliminarily adopted "completing one another" which "avoids the subjective language." Appx458-59.

167); Appx161 (6:26-28)) (explaining that "texturing can include teeth, ridges, friction increasing elements, keels, or gripping or purchasing projections")). Globus pointed out that this was the only usage of "complementary" in the specification, which is consistent with the common meaning "completing." Appx596.

Globus further noted that the prior art references relied on by Life Spine, including Olmos, use "complementary" consistent with the common meaning "completing"—not the broad construction proposed by Life Spine. Appx596-97 (citing Appx2058-59 (¶ 168); Appx1432-44 (Olmos ¶¶ [0014], [0088]-[0089], [0096], [0157], [0165]); Appx1457 (Baynham ¶ [0030]); Appx1550 (24:22-27)).

Globus also identified ramped portions in the patent figures that are "complementary with one another." For example, the Figure 40 and Figure 50 embodiments depict a side ramped portion ("1st Ramped Portion") on the lower endplate and a side ramped portion ("2nd Ramped Portion") on the upper endplate, and those side ramped portions complete one another when the implant is in the collapsed (unexpanded) state:

**Patent Owner Annotated**
**('731 Patent, Figure 40)**




FIG. 40

**Patent Owner Annotated**
**('731 Patent, Figure 50)**




FIG. 50

Appx597-98 (citing Appx2059-61 (¶ 169)). These identified ramped portions

complete each other to form the sidewall of each implant when the implants are in the unexpanded (collapsed) state.

Globus further demonstrated that the prosecution history supports that "complementary" is used in accordance with its common meaning, which excludes "mirrored" ramped portions. Appx598-600. Before the "complementary" limitation was added, the Examiner used text and arrow annotations to identify a "First ramped surface" (red highlighting) and a "Second ramped surface" (green highlighting) in the embodiment of Olmos depicted in Figures 16B, 20A, and 21A:




FIG. 16B




FIG. 21A FIG. 20A

Appx1360-61. As shown in Figure 16B, the "ramped surface[s]" identified by the Examiner mirror one another when the implant is assembled; they are separated by a distal wedge 208 and cannot complete one another.

The applicant then amended claims 1 and 17 (which issued as claim 10) to require that the "first endplate includes a first side portion" having a "first ramped portion," the "second endplate includes a second side portion" having a "second ramped portion," and those "ramped portion[s] are ***complementary with one another***." Appx1342, Appx1344. These were the only limitations added to those claims.

The applicant then argued:

> Applicant has amended independent claims 1 and 17 in order to further distinguish the claims from the cited art. In particular, independent claims 1 and 17 now recite "wherein the first endplate includes a first side portion, the first side portion including a first ramped portion ... wherein the second endplate includes a second side portion, the second

side portion including a second ramped portion, wherein the first ramped portion of the first endplate and the second ramped portion of the second endplate are complementary with one another," **which is not disclosed in Olmos**.




FIG. 40 of the Present Application

**The claim amendments cover, for example, the embodiment illustrated in FIG. 40 of the present application** (reprinted below) and described in its associated disclosure. **Olmos, in contrast, does not disclose** a first endplate having a first side portion with a first ramped portion and a second endplate having a second side portion with a second ramped portion, *wherein the first ramped portion of the first endplate and the second ramped portion of the second endplate are complementary with one another* in any of the embodiments cited in the Office Action. Accordingly, independent claims 1 and 17 are in condition for allowance.

Appx1347 (italics in original, bold emphasis added). The applicant thus expressly made two points. First, that Olmos's disclosed embodiment does ***not*** fall within the scope of the amended claims because its mirrored ramped portions are ***not***

"complementary with one another." Second, that the Figure 40 embodiment ***does*** fall within the scope of the claims, as it discloses ramped portions (e.g., the "1st Ramped Portion" and "2nd Ramped Portion" identified below) that are "complementary with one another:"

**Patent Owner Annotated**
**('731 Patent, Figure 40)**




Globus then argued "[i]n view of the Specification, prosecution history, and the relevant art in the field, a POSITA would understand that two ramped portions that are 'complementary with one another" necessarily complete one another." Appx600 (citing Appx2063 (¶ 172)). It is undisputed that the mirrored ramped portions of Chung and Olmos do not "complete one another." *Id.*

Globus also explained that Life Spine's singular reliance on the Examiner's unsubstantiated interpretation of "complementary" was misplaced. For one, the Examiner was required to apply the "broadest reasonable interpretation" ("BRI")

standard (*see* MPEP § 2111), not the narrower *Phillips* standard applicable to *inter partes* reviews (*see* 37 C.F.R. § 42.100). Given that the Examiner's interpretation was remarkably broader than the ordinary meaning of "complementary," at best it would comport with that BRI standard. Appx600-601. Indeed, although the ordinary meaning of "complementary" is "completing," as discussed below the Examiner applied "completing one another" as also encompassing ramps that clearly ***cannot*** complete one another (e.g., mirrored ramps separated by a wedge). Appx601.

In fact, even the Examiner appeared to recognize that his initial identification of mirrored ramped portions as "complementary with one another" was a stretch, so he resorted to identifying ***hypothetical*** orientations of endplates as "complementary." *Id*. For example, the Examiner annotated Olmos's figures and stated that "one ***can*** orient the first and second ramped portions [of Olmos] such that they are complementary with one another":




Appx1335 (emphasis added). The Examiner thus disassembled Olmos' implant and reversed the orientation of the endplates (202, 204), creating a hypothetical, non-functional implant to try and map the "complementary" limitation.

The Examiner resorted to similar hypothetical orientations for U.S. Patent No. 6,176,882 ("Biedermann"). Appx602-603. In reference to Figure 1 of Biedermann, the Examiner identified ramped portions (elements 64 and 63', red boxes below) on complete opposite ends of upper and lower engagement members (elements 60 and 61) as being hypothetically "complementary with one another" because they could be rearranged to fit over one another, even though those two surfaces are never in proximity with one another when the implant is assembled and functional:




Appx1335 ("other ramped portions *can be* complimentary with each other"). Globus thus demonstrated that the Examiner's interpretation of "complementary" was inconsistent with the specification, common meaning of the term, and prior art.

Globus further pointed out that the only other evidence cited by Life Spine was the unsubstantiated testimony of its expert discussing concepts like "common planes," "horizontal" planes," "symmetrical expansion," "asymmetrical forces," "symmetrical movement," and "machine tolerances." Appx603. Globus argued that this testimony was improperly incorporated by reference and that Mr. Drewry cited no evidence to support his understanding of "complementary," other than the Examiner's unilateral interpretation. *Id.*

*3. Petitioner's Reply*

Life Spine did not dispute that the applicant added the "complementary" limitation to exclude the mirrored ramped portions of Olmos and instead encompass the side ramped portions of Figure 40 that complete each other when the implant is collapsed. Appx616-618. Nor did Life Spine dispute that: (1) the common meaning of "complementary" is "completing" as evidenced by a general-purpose dictionary; (2) the specification uses "complementary" consistent with that meaning; and (3) the very prior art references cited by Life Spine (including Olmos and Baynham) use "complementary" consistent with that meaning. *Id.* Life Spine instead argued that the Board was required to adopt the Examiner's broad and unsubstantiated interpretation of "complementary" because the applicant allegedly did not object to the Examiner repeatedly applying "complementary" to mirrored ramped portions of disassembled, rearranged implant components. *Id.*

Life Spine admitted, however, that the applicant did *not* disclaim the plain and ordinary meaning during prosecution. Appx617-18. Life Spine argued that Globus was attempting a "*post-facto* disclaimer." *Id*. According to Life Spine, the applicant's alleged "silence" in the face of the Examiner's mapping to hypothetical and non-functional orientations bound Globus to the Examiner's construction. Appx618.

Life Spine further contended that the mirrored ramped portions of Olmos and

Chung are "complementary with one another" even under the construction "completing one another." Specifically, Life Spine argued that "Claim 10 contains no requirement regarding the configuration(s) in which the endplates must 'complete each other,'" and then engaged in the same hypothetical rearrangement of disassembled implant components as the Examiner, where the prior art endplates are rearranged in a non-functional manner to make the ramped portions "complementary with one another." Appx632, 647 (arguing that the ramped portions of Chung and Olmos "could be aligned to 'complete' each other" by disassembling the implant).

Finally, Life Spine fundamentally deviated from the invalidity theory in its Petition by identifying entirely new portions of Olmos's implant as allegedly satisfying the Board's construction and arguing that it would have been obvious to modify Olmos's implant to have complementary ramped portions under that construction. Appx647-653.

*4. Patent Owner's Sur-Reply*

Globus offered five counter claim construction arguments to the reply.

First, Life Spine waived its theory that Globus's alleged silence requires that the Board adopt the Examiner's interpretation, as that theory was never raised in the Petition despite Life Spine addressing claim construction. Appx691.

Second, Life Spine admitted that the plain and ordinary meaning applies, while also admitting that the applicant had ***not*** disclaimed during prosecution. *Id.*

Because there was no disclaimer, the ordinary meaning—as evidenced by the specification, the applicant's statements during prosecution, the prior art and the dictionary—applies.

Third, Life Spine's assertion that the applicant was "silent" in the face of the Examiner's application of "complementary" was false. Appx691-92. In response to the Examiner's unreasonable application of "complementary" in multiple office actions, the applicant repeatedly stated it was "***not*** conceding in this application that previously pending claims are not patentable over the cited references" and that the amendments were "made to facilitate expeditious prosecution" and not a "disclaimer[] or disavowal[]." Appx1296; Appx1247; Appx1191; Appx1122-23 (emphasis added). The applicant also expressly stated that Olmos does not disclose the "complementary" limitation when it added that limitation, making it clear that the applicant did not consider mirrored ramped portions to qualify as "complementary with one another" Appx1347.

Fourth, there was no precedent where a patentee was found to disclaim the plain and ordinary meaning for a different meaning based on an examiner's unilateral application of prior art. Appx692.

Fifth, Life Spine still failed to justify its reliance on the Examiner's interpretation of "complementary" given that the Examiner was required to apply the BRI standard and the Examiner's interpretation was at odds with all credible

evidence demonstrating that the plain and ordinary meaning of "complementary" is "completing." Appx692-93.

With respect to Life Spine's argument that the mirrored ramped surfaces of Olmos and Chung's implants could hypothetically be disassembled to rearrange the ramps to satisfy the Board's construction, Globus explained that the claims are directed toward a functional, assembled implant, rendering Life Spine's mapping unreasonable on its face. Appx700-701.

As to Life Spine's new identification of different parts of Olmos as allegedly being "ramped portions" that are "complementary with one another," Globus demonstrated that Life Spine's identification was based on an unreasonable interpretation of "ramped portion" as any surface with a curve, and that one of skill in the art would not consider the newly identified portions to be "ramped portions" that complete one another. Appx710-725.

### B. The Final Written Decision

The Board "beg[a]n with the language of the claims," finding that the term "complementary" is used only in independent claim 10 and that it "indicates a relationship between the endplate ramp portions (i.e., the ramped portions are 'complementary' 'with one another') but does not otherwise provide insight into the meaning of the term." Appx29. The Board further found that the claim language does not suggest that "complementary" has a special meaning in the '731 patent. *Id.*

The Board "next turn[ed] to the Specification," finding that Life Spine was mistaken that the specification "gives no indication" as to how two elements are "complementary":

> We disagree. Although the Specification does not define the term "complementary," it provides an example of complementary features, i.e., texturing or engagement features on one surface that engage with corresponding features on another surface. *See* Ex. 1001, 8:36–40; *see also id.* at 6:26–28 ("texturing can include teeth, ridges, friction increasing elements, keels, or gripping or purchasing projections"). This example is consistent with the plain and ordinary meaning of the term complementary, which is "completing one another."

Appx30-31.

The Board then turned to the prosecution history, first finding that "[a]s [Globus] correctly explains," the Examiner had identified two mirrored ramped surfaces of Olmos's implant as a "first ramped surface" and a "second ramped surface." Appx31. The Board further found that the applicant had specifically amended the claims to include the "complementary with one another" limitation to distinguish from Olmos's mirrored ramped surfaces and specifically cover the mating side ramped portions of Figure 40. Appx32-33.

The Board acknowledged that "the Examiner continued to reject the claims over Olmos" based on disassembling Olmos and Biedermann's implants and rearranging their endplates such that the identified first and second ramped portions

could be fitted over one another. Appx33-36. The Board also acknowledged that the applicant had initially deleted "complementary with one another," but later re-added it back into independent claim 17 (which issued as claim 10). Appx36. The Board found, however, that the amendments specifically included the following language under the heading titled "No disclaimers or disavowels [sic]":

> Although the present communication may include alterations to the application or claims, or characterizations of claim scope or referenced art, Applicants are not conceding in this application that previously pending claims are not patentable over the cited references. Rather, any alterations or characterizations are being made to facilitate expeditious prosecution of this application.

Appx36-37 (quoting Appx1191; Appx1122-23). Based on the foregoing findings, the Board addressed the arguments relating to the prosecution history.

The Board correctly noted that the parties agreed that "complementary with one another" has a plain and ordinary meaning and that neither party argued that the applicant acted as its own lexicographer or disavowed claim scope. Appx37. The Board thus determined that its "task is to discern the plain and ordinary meaning of 'complementary with one another'" *Id.* (citing *Hill-Rom*, 755 F.3d at 1371 ("We depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal.")).

The Board explained that the specification provides an example of

"complementary" with respect to the texturing and engagement features but "does not provide an express definition for the term." Appx38. The Board thus found "a general purpose dictionary informative in articulating the plain and ordinary meaning of this term," which defines "complementary" to mean "completing." *Id.* (citing Appx2164 (Am. Heritage Dictionary); *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("A court may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record.")).

The Board determined that the specification's discussion of "complementary texturing or engagement features" that are designed to "engage with" corresponding texturing or engagement features "is consistent with a plain meaning of 'complementary' as indicating 'completing,' but does not support a plain meaning that encompasses ramped portions having angles that mirror each other." Appx39.

The Board noted that other spinal implant prior art cited by Life Spine (including Olmos and Baynham) use the term "complementary" to describe structures that complete one another—not structures that mirror one another. Appx40-41. The Board credited the testimony of Mr. Culbert that "[e]ach use of 'complementary' in these exhibits refers to improving the physical engagement between two things by having them complete one another." Appx41. Consequently, the Board found that those references are consistent with the plain meaning of

"complementary" as indicating "completing," but that they do not support a plain meaning encompassing ramped portions having angles that mirror each other. *Id*.

The Board further determined that Figure 40 of the '731 patent, which was specifically cited by the applicant as written description support for the "complementary with one another" amendment, is consistent with the common meaning "completing" because it depicts "first and second ramped portions of the device's endplates that fit over one another along at least a portion of their lengths":

**Patent Owner Annotated ('731 Patent, Figure 40)**




Appx39-40. The Board also found that the applicant specifically added the disputed claim language to exclude the "mirrored" ramped surfaces of Olmos identified by the Examiner (and now Life Spine), while encompassing the identified "1st" and "2nd" side ramped portions of Figure 40 that fit over one another. Appx41.

The Board rejected Life Spine's "singular reliance on the prosecution history as allegedly indicating the plain and ordinary meaning," which was based on the erroneous assumption that the Examiner was applying the plain and ordinary meaning. Appx38-39. The Board noted that Life Spine failed to identify any persuasive evidence to support that assumption, including any intrinsic or extrinsic evidence that uses "complementary" to encompass mirrored ramped surfaces. Appx39.

The Board explained that the Examiner "resorted to identifying hypothetical orientations of Olmos's and Biedermann's end plates in order to map them to the 'complementary with one another' limitation" and that such an interpretation "at best comports with the 'broadest reasonable interpretation' standard the Examiner was required to apply, but does not comport with the *Phillips* claim construction standard applicable here." Appx41-42. The Board noted that "[i]n continuing to press its claim construction based on the prosecution history, [Life Spine] fails to address or account for this important distinction (i.e., broadest reasonable interpretation versus *Phillips*)." Appx42.

The Board also rejected Life Spine's acquiescence by "silence" theory, which was raised for the first time in the Reply. The Board found that Life Spine "mischaracterizes the prosecution history, because the applicant was not 'silent' in response to the Examiner's mappings.'" Appx42. First, the Board found that "upon

adding the 'complementary with one another' limitation to the claims, the applicant expressly stated that Olmos—which discloses only ramped surfaces having mirrored angles of inclination—does not disclose the limitation," and that this "put skilled artisans on notice" that the applicant did not consider Olmos's mirrored ramped surfaces to qualify. Appx43. Second, the Board found that there was no "acquiescence" because, in response to each of the Examiner's mappings to the prior art ramps, the applicant stated that it was "'not conceding in this application that previously pending claims are not patentable over the cited references,'" and that the claim amendments were "'made to facilitate expeditious prosecution'" and were not a "'disclaimer[] or disavowal[].'" Appx43 (quoting prosecution history).

The Board also explained that even if Globus had been silent, a "patentee is not required to fight tooth and nail every possibly adverse thought an examiner commits to paper, nor to advance redundant arguments for patentability." Appx42, n.14 (quoting *TorPharm, Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003)). Indeed, the Board determined that Life Spine "identifies no precedent where a patentee was found to disclaim the plain and ordinary meaning of a claim term based on an alleged acquiescence to a broader meaning ascertained from an examiner's application of prior art to the claimed." Appx43.

The Board concluded that, based on the intrinsic and extrinsic evidence, "the plain and ordinary meaning of the term 'complementary with one another' means

'completing one another'" and that the prosecution history does not demonstrate that the disputed term encompasses mirrored ramp portions. *Id*.[5]

The Board then found that the identified "ramped portions" of Chung and Olmos were not "complementary with one another" because they do not complete one another. Appx74-78 (addressing Chung); Appx107-110 (addressing Olmos). In so doing, the Board expressly rejected Life Spine and its expert's illogical position that those ramped portions are "complementary with one another" because the endplates of Chung could *hypothetically* be disassembled so that the ramped portions could be reoriented to be complementary, rendering the implant non-functional. Appx78; Appx109-110.

The Board also analyzed Life Spine's new invalidity theory, which pointed to new portions of Olmos's Figure 16 embodiment as alleged "ramped portions" that are "complementary with one another." Appx110-117. The Board determined that Life Spine was improperly equating any surface having a "curve" to a "ramped portion" based on a mischaracterization of the specification. Appx110-114. The Board also rejected Life Spine's implausible argument that an intended design feature of Olmos's implant was instead an "imperfection" that one of skill in the art would have found obvious to modify to make "complementary." Appx116-117.

---

[5] This construction is the same as the preliminary construction adopted by the Board in the Institution Decision. Appx28.

### C. Request for Director Review

Life Spine sought Director Review of the Board's determination that Life Spine failed to demonstrate that claims 10-14 were unpatentable. Appx805-821. Life Spine argued that the Board erred by: (1) construing "complementary with one another" to exclude the mirrored ramped surfaces of Olmos and Chung and (2) rejecting Life Spine's new mappings to Olmos under the Board's construction.

In so doing, Life Spine raised numerous new arguments. For example, Life Spine argued that the amendments made during prosecution were *not* intended to distinguish the invention from "Olmos's ramped surfaces having mirrored angles." Appx809-810. Life Spine also argued that the prior art does *not* use "complementary" consistent with the "completing one another." Appx811-812. The Request for Director Review was denied. Appx824-25.

### D. Appeal

The sole issue on appeal is whether the Board properly construed "complementary with one another" to mean "completing one another," which Life Spine concedes is not met by Chung or Olmos. BB12. Life Spine is not appealing the Board's determination that Olmos and Chung fail to disclose ramped portions that "complete one another," either under Life Spine's original mappings or the mappings it offered for the first time in its Reply.

## III. SUMMARY OF THE ARGUMENT

The Board correctly accorded "complementary with one another" its plain and ordinary meaning "completing one another," which is uniformly supported by all *credible* intrinsic and extrinsic evidence. Recognizing this, Life Spine resorts to mischaracterizations of the Board's claim construction analysis, the evidence and the law on disclaimer.

(Section IV.A) Life Spine first criticizes the Board as improperly beginning its claim construction analysis with a general-purpose dictionary that was "at odds with the intrinsic evidence." BB37. But the Board began with the claims and the specification, and simply determined that both use "complementary" consistent with its common meaning, as evidenced by the dictionary. The Board thus properly followed this Court's precedent that "judges are free to consult dictionaries and technical treatises … so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1323.

(Section IV.B) Life Spine next argues that the Board erred "because a ***general-purpose*** dictionary does not reflect the ordinary meaning of 'complementary' ramped portions within the field of ***spinal implant devices***." BB38 (emphasis in original). However, Life Spine provides no evidence that "complementary" has a special meaning in the field of spinal implants. To the

contrary, all evidence—including the prior art relied on by Life Spine—reflects that "complementary" in the field of spinal implant devices is used consistent with its common meaning "completing." Tellingly, Life Spine cites no evidence that anyone—other than the Examiner and Life Spine's expert—has ever used "complementary" differently.

(Section IV.C) Life Spine also disregards the significance of the specification *exclusively* using "complementary" consistent with its common meaning—not with the different meaning proposed by Life Spine. Life Spine argues that this usage is irrelevant because (1) "complementary" is used in reference to texturing or engagement features rather than ramped portions, (2) texturing or engagement features allegedly have a purpose different from ramped portions, and (3) "complementary" is allegedly used to refer to an "unclaimed embodiment." BB44-46. These alleged distinctions are wholly irrelevant—the simple indisputable fact remains that the specification uses the term "complementary" in accordance with its common meaning and ***inconsistently*** with Life Spine's unsubstantiated construction. Which specific features the term "complementary" describes in the specification is irrelevant to the fact that the specification demonstrates that the inventor used that term consistent with its common meaning.

(Section IV.D) Life Spine further contends, for the first time on appeal, that the Board's construction excludes the Figure 40 embodiment from the scope of the

claims. BB40-43. Even if this improper new argument were to be considered, it has no merit. Figure 40 plainly depicts ramped portions that "complete one another", and thus they are encompassed by the Board's construction. Life Spine's contrary argument is premised *entirely* on the fact that the specification does not specifically identify those ramped portions by name (i.e., calling them "ramped portions"). But whether the specification expressly calls them "ramped portions" is wholly irrelevant to whether Figure 40 *depicts* ramped portions that fall within the scope of the Board's construction. Indeed, when the applicant added the "complementary with one another" limitation during prosecution, it expressly stated that limitation "covers" the Figure 40 embodiment.

(Section IV.E) Life Spine alleges, also for the first time on appeal, that the Board's construction "is vague and therefore improper" because "it is open to many multiple interpretations." BB43-44. Tellingly, however, Life Spine does not identify these so-called "many multiple interpretations." Life Spine instead complains that it is unclear whether the side ramped portions of Figure 40 "complete one another" because "gaps" are allegedly depicted between the ramped portions. But nothing about "completing one another" requires that the ramped portions fit perfectly together, as evidenced by the side ramped portions of Figure 40 fitting over one another without appearing to form a seal along the entire surface.

(Section IV.F.1) Life Spine misleadingly asserts that when Globus added the

"complementary" limitation to the claim and identified Figure 40, it was because Globus was attempting to ***claim*** the mirrored ramped surfaces of that figure. BB47-48. However, this is the exact opposite of what happened—the amendment and argument was made specifically to ***exclude*** Olmos's mirrored ramps and require that ramped portions complete one another (e.g., as depicted in Figure 40).

(Section IV.F.2) Life Spine's singular and persistent reliance on the Examiner's application of "complementary" is also misplaced. BB47-50. As the Board correctly found, Life Spine improperly disregards that the Examiner was not applying the term consistent with its plain and ordinary meaning, as evidenced by the overwhelming intrinsic and extrinsic evidence. Likewise, Life Spine continues to ignore that the Examiner was required to apply the broadest reasonable interpretation standard, not the narrower *Phillips* standard applicable here.

(Section IV.F.3) Life Spine characterizes the applicant as "acquiescing" to the Examiner's incorrect claim construction via alleged "silence." BB51. The Board correctly found, however, that there was no acquiescence because the applicant expressly stated that the mirrored ramps of Olmos do not qualify as "complementary" and repeatedly stated it was not acquiescing to the Examiner's application of the claims.

(Section IV.F.4) Life Spine attempts to pigeonhole the facts of this case into entirely inapplicable Federal Circuit precedent. *Id.* Nothing in this Court's precedent

supports disposing of the ***plain and ordinary*** meaning of a term—as evidenced by *all* credible intrinsic and extrinsic evidence—for an Examiner's unreasonable interpretation. Even if this premise could be supported, it would be on the basis that the patentee *disclaimed* the plain and ordinary meaning. Because Life Spine admits that there was no disclaimer, "complementary with one another" cannot be changed to ensnare the prior art.

## IV. THE BOARD CORRECTLY CONSTRUED "COMPLEMENTARY WITH ONE ANOTHER"

Life Spine criticizes the Board for allegedly beginning its claim construction analysis with a dictionary definition that is "at odds with the intrinsic evidence," "dismissing intrinsic evidence that contradicted" the dictionary, and adopting a construction that is "inconsistent with preferred embodiments . . . as well as the prosecution history. BB37. These arguments are premised on mischaracterizations of the Board's analysis, the specification, and the prosecution history.

### A. The Board Properly Consulted the Dictionary Definition, which is Consistent with the Usage in the Claim, Specification and Prior Art.

Life Spine contends that the Board's construction "does not reflect the ordinary meaning to a POSITA," because the Board purportedly "first turn[ed] to extrinsic evidence—a general-purpose dictionary cited by neither party." *Id.* This contention is plainly false.

The Board "beg[a]n with the language of the claims" to determine whether

the usage of the claim term "provide[s] insight into the meaning of the term," including whether there is a suggestion in the claim language that the term is accorded a special meaning. Appx29; *In re Power Integrations, Inc.*, 884 F.3d 1370, 1376 (Fed. Cir. 2018) ("[C]laim construction must begin with the words of the claims themselves.") (quoting *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 457 F.3d 1293, 1301 (Fed. Cir. 2006)).

Finding no such insight or special meaning, the Board "next turn[ed] to the Specification." Appx29-30; *Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis.") (internal quotation marks and citations omitted). Although Life Spine argued that "[t]he '731 patent specification itself gives no indication of what is required for elements to be 'complementary with one another'" (Appx941), the Board appropriately rejected that argument because the term "complementary" is used in the specification only to refer to structures that engage one another, which is consistent with the common meaning "completing one another." Appx30-31 (citing Appx162 (8:34-40)). Indeed, "[t]he ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. That is the case here.

Life Spine mischaracterizes the Board as elevating the definition from a

general-purpose dictionary above the intrinsic evidence. However, the Board followed well-established precedent by consulting a dictionary to understand the common meaning of "complementary" and determine whether the claim and specification use the term consistent with its common meaning:

> [W]e do not intend to preclude the appropriate use of dictionaries. Dictionaries or comparable sources are often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation. . . . As we said in *Vitronics*, judges are free to consult dictionaries and technical treatises "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."

*Phillips*, 415 F.3d at 1323-24 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584, n.6 (Fed. Cir. 1996)); *see also Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("[I]n determining the ordinary and customary meaning of the claim term as viewed by a person of ordinary skill in the art, it is appropriate to consult a general dictionary definition of the word for guidance.").

Consistent with this precedent, the Federal Circuit routinely approves reliance on dictionary definitions to understand the common meaning of a term and aid in determining the plain and ordinary meaning. For example, in *Imaginal Systematic, LLC v. Leggett & Platt, Inc.*, the Federal Circuit rejected the argument that "the

district court relied too heavily on dictionary definitions" in according a claim term its plain and ordinary meaning. 805 F.3d 1102, 1111 (Fed. Cir. 2015). The Court found that the patent did not "expressly define 'vision guidance system,'" and that it was appropriate for the district court to turn to the dictionary definitions of "vision" and "guidance," as well as definitions of words making up those definitions, to determine the plain and ordinary meaning. *Id.*

In *Starhome GmbH v. AT&T Mobility LLC*, the Federal Circuit relied on multiple dictionary definitions for the term "gateway" and then examined the term "in the context of the claims and specification" to conclude that "one of ordinary skill would have understood that the inventors ***did not depart*** from the ordinary meaning of 'gateway' with their use of the term 'intelligent gateway.'" 743 F.3d 849, 856-57 (Fed. Cir. 2014) (emphasis added). The term was thus accorded "its ordinary meaning as a device that connects different networks." *Id.*

Here, the Board similarly consulted a general-purpose dictionary to ascertain whether the claim and specification use "complementary" consistent with its ordinary meaning. Because they do, and because the patentee did not redefine "complementary" or disclaim during prosecution,[6] the Board correctly determined that the ordinary meaning applies.

[6] Globus responds to Life Spine's mischaracterization of the prosecution history in Section IV.F below.

Life Spine also argues that the Board defaulted to adopting the dictionary definition solely "because" the disputed term is not expressly defined in the specification. BB37 ("The Board did so ***because*** 'the Specification gives an example of the term 'complementary,' but does not provide an express definition for the term.'") (quoting Appx38) (emphasis added). That is simply not true. As explained above, the Board appropriately consulted the dictionary definition because it reflects the ordinary meaning of "complementary" as overwhelmingly evidenced by the intrinsic and extrinsic evidence. Life Spine provides no evidence to the contrary.

Life Spine alleges that several Federal Circuit cases support its position that the Board improperly relied on the dictionary to "trump the understanding of a person of ordinary skill." BB39. But the cited cases actually undermine that position. *Anderson v. Int'l Engineering & Manufacturing, Inc.* is cited for the proposition that "a word describing patented technology takes its definition from the context *in which it was used by the inventor*." 160 F.3d 1345, 1348-49 (Fed. Cir. 1998) (emphasis added). Here, both in the specification (Appx162 (8:34-40)) and during prosecution (Appx1347) the "context in which ["complementary"] was used by the inventor" is to refer to ***two parts that complete one another*****,** not parts that merely mirror one another as Life Spine proposes. Further, in *Anderson* the patentee relied on a dictionary definition of "away" to argue that the phrase "away from the tool" merely requires a direction of movement opposite the tool, rather than more narrowly

requiring disengagement or separation from the tool. *Anderson*, 160 F.3d at 1348. In that case, the Court determined that the specification supported only the narrower interpretation, and in fact cited another dictionary definition consistent with that interpretation. *Id.* at 1348-50. Likewise, here the specification supports only one meaning of the term "complementary"—i.e., the common meaning "completing." The Board thus did not follow the *Texas Digital* line of cases as Life Spine alleges, but instead followed *Phillips*. Appx40. By adopting the common meaning of "complementary," the Board properly accorded the term the "full scope of its plain and ordinary meaning" consistent with the written description. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).

Life Spine's citation to *Renishaw PLC v. Marposs Societa' Per Azioni* is likewise unavailing. BB39. Life Spine cites it for the proposition that "a common meaning, such as one expressed in a relevant dictionary, that flies in the face of the patent disclosure is undeserving of fealty." 158 F.3d 1243, 1250 (Fed. Cir. 1998). However, the common meaning of "complementary" here does not "fly in the face" of the specification. Rather, the common meaning is wholly consistent with the usage of "complementary" in the specification. In fact, the only meaning that flies in the face of the specification is the one proposed by Life Spine.

Finally, Life Spine argues that the Board erred by consulting the dictionary definition because the "full definition" includes alternative definitions. BB38. Life

Spine is wrong. Dictionaries are expected to include alternative definitions, some of which may apply in one context but not another. The only definition consistent with the usage in the specification and the field of physical mechanics is "completing." The Board appropriately consulted that applicable definition as evidence of the common meaning of "complementary." Life Spine cites no precedent that suggests that the existence of alternative definitions somehow renders the dictionary irrelevant to understanding the common usage of a word used in a claim. Under such a principle, it would almost always be improper for judges to rely on dictionary definitions, as most words have alternative definitions depending on the context. But that position would contradict *Phillips's* explicit allowance of using dictionaries to construe claim terms. *See Phillips*, 415 F.3d at 1322-23.

### B. All Credible Evidence Demonstrates "Complementary" is Used in Accordance with its Common Meaning In the Field of Spinal Implants.

Life Spine argues that "the Board's definition from a ***general-purpose*** dictionary does not reflect the ordinary meaning of 'complementary' ramped portions within the field of ***spinal implant devices***." BB38 (emphasis in original). Yet Life Spine does not cite any credible evidence that the term "complementary" has a special meaning in the field of spinal implant devices. To the contrary, all credible evidence proves that in the context of spinal implants "complementary" is used in accordance with its well-accepted, common meaning.

As a prime example, Olmos discusses "complementary" retention structures that engage and a spline "for **<u>cooperating with</u>** a ***complementary*** keyway." Appx1437 (¶ [0088]: "the ***complementary*** retention structures 44 can ***<u>engage</u>*** the retention structures 40 of the inner member 32"); *Id.* (¶ [0089]: "The actuator shaft 30 can … include a noncircular cross section or to have a rotational link such as an axially-extending spline on the inner member 32 for **<u>cooperating with</u>** a ***complementary*** keyway on the outer sleeve member 34"); *See also* Appx1432-44 (¶¶ [0014], [0096], [0157], [0165]) (using "complementary" consistent with "completing"). Olmos thus uses "complementary" consistent with its common meaning "completing."

Likewise, Baynham discusses "upper section" 11 and "lower section" 13 of a spinal fusion device that "**<u>move along</u>** the ***complementary*** inclined plane to shorten the fusion device and increase the distance between the end plates of the adjacent vertebrae" when the surgeon turns a jack screw to expand the device. Appx1457 (¶ [0030]). As shown in Figure 1 of Baynham (annotated below), section 11 (red) has a bottom surface that is complementary with an upper inclined surface of body 47 (green) and section 13 (blue) has a top surface that is complementary with the lower inclined surface of body 47 (green), and each section "move[s] along" its respective complementary surface:



FIG. 1

Appx1450 (annotated); Appx1456-57 (¶¶ [0022], [0030]).

Notably, Olmos and Baynham constitute intrinsic evidence because they were cited during prosecution, entitling their usage of "complementary" to even greater evidentiary weight than extrinsic evidence. Appx129 (listing Olmos and Baynham as cited art and identifying each using an asterisk, which means that the Examiner applied each in an office action rejection); *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("This court has established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'") (quoting *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir.

2003)); *Lynk Labs, Inc. v. Samsung Elecs. Co.*, 125 F.4th 1120, 1135 (Fed. Cir. 2025) (explaining that "prior art cited in a patent . . . constitutes intrinsic evidence").

Christensen (US 8,906,095 B2), another reference relied on by Life Spine in its Petition, describes the profile of columnar body of a fusion device as being generally ***complementary*** to the profile of the inter-vertebral elements of the disc implant. Appx1550 (24:22-26). In other words, the columnar body and inter-vertebral elements have profiles that allow them to complete one another.

In analyzing these interbody fusion references, the Board credited the testimony of Mr. Culbert that "[e]ach use of 'complementary' in these exhibits refers to improving the physical ***engagement between two things by having them complete one another***." Appx2059 (¶ 168) (quoted by Appx41). The Board thus concluded that "these references are also consistent with a plain meaning of 'complementary' as indicating 'completing,' but do not support a plain meaning that encompasses ramped portions having angles that mirror each other." Appx41. These fact findings are supported by substantial evidence—namely the spinal fusion references themselves and the testimony of Mr. Culbert. *See Google LLC v. Network-1 Techs., Inc.*, 726 F App'x 779, 782 (Fed. Cir. 2018) ("A finding of fact is supported by substantial evidence if a reasonable mind might accept the evidence as adequate support for the finding."). Indeed, Life Spine ***never*** argued to the Board that these references are inconsistent with the plain and ordinary meaning, or that they

somehow support Life Spine's broad construction.[7]

While Globus's position is supported by substantial evidence, Life Spine cites no *credible* evidence that "complementary" has ever been used—either inside or outside the field of spinal fusion implants—to refer to two parts that do not complete one another. Life Spine instead relies exclusively on the unsubstantiated testimony of Mr. Drewry to argue that "the ordinary meaning of 'complementary' parts *in light of the specification* includes parts that 'interact in a generally identical, symmetrical way,'" which would allegedly "include ramped portions that had the 'same angle relative to the common plane between them.'" BB38 (quoting Appx942 (¶ 182)) (emphasis added). This testimony was properly rejected by the Board.

First, this testimony is flawed on its face because the specification never uses "complementary" in the manner proposed by Mr. Drewry. Indeed, the only usage of "complementary" in the specification refers to two components that complete one another. Appx162 (8:34-40). Because the specification never uses "complementary" in the manner proposed by Mr. Drewry, his proposed definition cannot be supported "in light of the specification."

Second, Mr. Drewry does not cite a single piece of evidence to justify his

---

[7] In the Request for Director Review, Life Spine argued for the first time that Olmos and Baynham do not use "complementary" consistent with "completing." Appx811-812. This argument was improperly raised then. In any event, in its appeal Life Spine has not disputed the Board's factual findings on this point.

understanding of "complementary," except for the Examiner's unsubstantiated interpretation. Instead, he attempts to justify his interpretation by discussing academic concepts like "common planes," "horizontal" planes," "symmetrical expansion," "asymmetrical forces," "symmetrical movement," and "machine tolerances." Appx942 (¶ 182) (cited by Appx225). What he does not do, however, is cite any credible evidence showing that the term "complementary" has ever been used in the different manner he proposes. Nor does he cite any evidence showing that the discussed concepts have ever been used to describe "complementary" mechanical parts. It was thus appropriate for the Board to reject Mr. Drewry's unsubstantiated testimony and instead correctly determine that all credible evidence demonstrates that "complementary" is used in accordance with its common meaning. Indeed, as explained above, even Olmos and Baynham—key prior art references relied on by Life Spine to try and invalidate the claims—use the term "complementary" in accordance with its common meaning "completing." Both Life Spine and Mr. Drewry simply ignore all this evidence because it undermines their position.

Third, Mr. Drewry's testimony on these concepts was improperly incorporated by reference into the Petition and, thus, should be given no weight. The Petition included no discussion of these concepts, and instead vaguely argued that "the Examiner understood, and a POSITA would have understood, the plain and

ordinary meaning of this phrase to encompass endplate first and second ramped portions having angles that mirror each other." Appx225 (citing Appx942 (¶¶ 180-182)). Globus pointed out "nothing resembling [Mr. Drewry's] discussion is found within the four corners of the Petition." Appx603 (citing *3M Co. v. Evergreen Adhesives, Inc.*, 860 F. App'x 724, 726 (Fed. Cir. 2021) ("3M has not pointed to any place in the record where Dr. Prud'homme's arguments ... were previously explained in a manner sufficient to avoid improper incorporation by reference.")). Although the Board did not expressly state that this testimony was improperly incorporated by reference, the Board strongly suggested that it was. Appx75, n.22. Consequently, even if Mr. Drewry's testimony could support Life Spine's proposed construction, it is entitled to no weight on appeal.

Life Spine further argues that the Board erred because the definition of "complementary" allegedly "has ***nothing to do*** with spinal implant devices." BB38 (emphasis in original). However, the Board was presented with an abundance of objective evidence—including the prior art relied on by Life Spine—demonstrating that "complementary" is used in accordance with its common meaning in the field of spinal fusion implants. While Life Spine repeatedly alludes to the existence of some special definition of "complementary" in this field, it provides no evidence supporting that contention. The reason for this failure is obvious—"complementary" is used in the field of spinal fusion implants in accordance with its common meaning.

### C. Life Spine's Disregard of the Use of "Complementary" in the Specification Should be Rejected.

Life Spine argued in its Petition that "[t]he '731 patent specification itself gives no indication of what is required for elements to be "complementary with one another."' Appx941 (¶ 180) (cited by Appx225). The Board correctly determined that Life Spine was wrong, because the specification "provides an example of complementary features, i.e., texturing or engagement features on one surface that engage with corresponding features on another surface," that is consistent with the plain and ordinary meaning "completing." Appx31 (citing Appx162 (8:36-40)).

Importantly, in its Reply, Life Spine never disputed Globus's position that the specification uses "complementary" consistent with its ordinary meaning. Appx595; Appx616-618. Life Spine instead tries to downplay the significance of this evidence, essentially arguing that because the specification does not specifically reference "ramped portions" using the term "complementary," the use of that term with respect to engaging textures or engagement features is irrelevant. BB43 (arguing that "the specification provides ***not one example*** for the Board's (and Globus's) interpretation that claim 10's 'ramped portions' must 'complete one another' to the exclusion of ramped portions having mirrored angles") (emphasis in original). Life Spine misses the point.

The disputed claim phrase and specification both use the word "complementary." The Board was thus **required** to consider how that term is used

in the specification. *Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (internal quotation marks and citations omitted). While "complementary" is not used in the specification to specifically refer to "ramped portions," it is used to refer to features or surfaces that complete another—again, a point that Life Spine has never disputed. The Board properly understood "complementary" as used in both the claim and specification has the same meaning and, thus, the term is being used in accordance with its common meaning.

Life Spine also alleges that the Board's reliance on the use of "complementary" in the specification was "improper because it is directed to ***unclaimed*** embodiments." BB45 (emphasis in original). Tellingly, Life Spine cites no precedent for this notion. Indeed, the use of a disputed claim term in the specification is evidence of its intended meaning, even if the specification uses the term in reference to a claimed or unclaimed embodiment.

In this same vein, Life Spine erroneously contends that the Board erred because "complementary" as used in the specification refers to the engagement of two surfaces with complementary texturing, whereas the claim references "complementary" ramped portions. BB44-45. However, this too is an irrelevant distinction. The fact remains that the specification uses "complementary" in

accordance with its common meaning—"completing one another." Even though "complementary" is used by the specification in reference to engaging textures rather than engaging ramps, that does not change the fact that the term is being used in both the specification and the claim in accordance with its common meaning.

Recognizing this, Life Spine attempts to fabricate confusion by arguing that the Board improperly relied on the specification's use of "complementary," because the complementary texturing in the specification is allegedly intended to "grip" or "prevent sliding" or "movement" as between the endplates, whereas the complementary ramped portions of claim 10 are configured to "move outwardly" and "move inwards" relative to one another. BB44-46. Life Spine fails to provide any logical explanation for *why* this purported distinction matters. Just as the "complementary" textures discussed in the specification complete one another, so too do the complementary side ramped portions of Figure 40. The fact that the "complementary" texturing discussed in the specification may have a purpose different than "complementary" ramped portions is irrelevant to the fact that both the textures and ramped portions complete one another.

### D. The Board's Construction Does Not Exclude Preferred Embodiments.

Life Spine never argued to the Board that the adopted construction excludes a preferred embodiment from the specification, despite multiple opportunities to do so. *See generally* Appx423-425 (Life Spine's Preliminary Reply); Appx616-618

(Life Spine's Reply). The "exclusion" theory is thus improperly raised for the first time on appeal and should not be considered by this Court. *See Netflix, Inc. v. DivX, LLC*, 84 F.4th 1371, 1378 (Fed. Cir. 2023) ("Any argument not raised to the Board is forfeited, and we decline to consider it for the first time on appeal.").

Even if this argument is considered, it is premised on a blatant mischaracterization of the written description. Life Spine argues that the adopted construction would exclude Figure 40 of the '731 patent from the scope of claim 10. BB40-43. To convince the Court of this, Life Spine reproduces Figure 40 of the '731 patent as annotated by Globus in its Patent Owner Response:

**Patent Owner Annotated**
**('731 Patent, Figure 40)**




BB40-41. The portions identified by the red arrows are ramped portions that

"complete one another" as claimed. The "1st Ramped Portion" is part of the lower endplate 14 and corresponds to the claimed "first ramped portion," and the "2nd Ramped Portion" is part of the upper endplate 16 and corresponds to the claimed "second ramped portion." Those two ramped portions mate or engage together when the implant is collapsed and are thus "complementary with one another" as claimed—they are encompassed by the Board's construction.

Life Spine's new arguments to the contrary are premised on semantic gymnastics. Life Spine argues that the identified portions cannot be the ramped portions because "the annotated portions in the above figure are ***not identified as ramped portions*** in the specification." BB41 (bold in original, underlining added). However, whether these ramped portions depicted in the figures are specifically "identified" or "referenced" in the text of the specification using the words "ramped portion" is irrelevant to whether they are encompassed by the plain claim language. Life Spine tellingly does not argue that the identified portions do not qualify as the claimed "ramped portions," but merely argues that they are not ***referred to*** or ***called out*** as "ramped portions" by the specification. Because the "1st Ramped Portion" and "2nd Ramped Portion" are indisputably ramped portions that "complete one another," they are encompassed by claim 10 even though the specification does not explicitly label them as such.

Life Spine also provides its own partial, annotated version of Figure 43 and

argues that "complementary with one another" must encompass the first ramped portion 306 and second ramped portion 310:




BB41-42. The sole basis for Life Spine's position is that the specification refers to elements 306 and 310 as "ramped portions." According to Life Spine, that necessarily means that the "ramped portions" in the claims must be referring to elements 306 and 310. However, the specification ***never uses the term "complementary" to refer to these ramped portions***. The only usage of "complementary" in the specification refers to two surfaces or engagement features that complete one another, which is consistent with the common meaning of that term and the side ramped portions identified by Globus in Figure 40.

Globus further annotates the figure below to show that the upper endplate 16 has purple side ramped portions and the lower endplate 14 has blue side ramped

portions. While this figure depicts the implant expanded, when the implant is unexpanded (collapsed) those ramped portions complete one another (e.g., they fit over one another as shown in Figure 40):




Because these purple and blue ramped portions "complete one another," the Board's construction does not exclude this embodiment from the claims.

Recognizing this, Life Spine argues that because the mirrored ramped portions 306 and 310 would not satisfy the Board's construction, that necessarily means that the Board's construction excludes the embodiment depicted above. Not so. While the mirrored ramped portions 306 and 310 do not satisfy the Board's construction, the purple and blue ramped portions ***do satisfy the Board's construction***. The Board's construction thus does not result in this embodiment being excluded from

the scope of the claim—the side ramped portions identified by Globus in Figure 40 satisfy the Board's construction even if mirrored ramped elements 306 and 310 may not.

Life Spine also complains that ramped portions 306 and 310 are "expressly depicted as having mirrored angles and are entirely inconsistent with the Board's dictionary definition, and were thus ignored." BB43. However, the reason that elements 306 and 310 are "inconsistent with the Board's dictionary definition" is because *they are not complementary with one another*. The specification never describes them as such, and there is no credible evidence that "complementary with one another" refers to parts that do not complete one another.

Life Spine's argument that the Board's construction excludes the Figure 40 embodiment is also contradicted by the prosecution history. The applicant specifically amended claim 10 (which issued as claim 17) to include the "complementary" limitation and then argued that it "is **not** disclosed in Olmos" and that the amendment "***cover*[s]**, for example, the embodiment illustrated in Figure 40 of the present application." Appx1347 (emphases and alteration added). In other words, the "complementary with one another" limitation was specifically added to *distinguish from* Olmos's mirrored ramped surfaces, and the applicant specifically stated that the "complementary" language ***does*** encompass the Figure 40 embodiment, which has side ramped portions that are complementary because they

complete one another. *Supra* Section II.A.2 (discussing prosecution history in depth). This further demonstrates that the Board's construction encompasses the complementary side ramped portions of Figure 40, to the exclusion of mirrored ramped surfaces 306 and 310 in Figure 43 of the '731 patent and the mirrored ramps shown in Figures 16B, 20A and 21A of Olmos.

For the reasons above, the adopted claim construction does not exclude the embodiment depicted in Figure 40.

### E. There is Nothing "Vague" About the Board's Construction.

Life Spine argues that the Board's construction "is vague and therefore improper." BB43. As an initial matter, this argument was never raised before the Board and is thus forfeited for the purpose of appeal. *Netflix, Inc.*, 84 F.4th at 1378. Even if this argument were to be addressed, it lacks credibility.

Life Spine contends that the common meaning is improperly "vague" because Figure 40 allegedly depicts "visible gaps between the two identified 'ramped portions,' yet the Board never explained how such gaps are consistent with its construction that ***these gaps*** 'complete' one another." BB43-44 (emphasis added). But the claim does not recite, and the Board did not conclude, that "gaps" must complete one another. Rather, the claim recites that "ramped portions" are "complementary with one another," and the Board concluded that the ramped *portions* must complete each other. As shown below, the ramped portions identified

by Globus in Figure 40 "complete one another" along part of the sidewall (red-highlighted portion).




Life Spine appears to be arguing that since the *entire* length of the surfaces do not form a seal, there is ambiguity regarding how the surfaces can be "complementary with one another." But the claim language only requires complementary ramped *portions*. There can be no legitimate dispute that the ramped surfaces complete one another along the red-highlighted portion, eliminating any ambiguity.

Life Spine also complains that the "Board's construction is open to many multiple interpretations, and the Final Written Decision provides no guidance save for the one example cited in Fig. 40 that is not even directed to what the specification identifies as 'ramped portions.'" BB44. As an initial matter, Figure 40 is "directed

to" complementary ramped portions as identified above, which was a point explicitly made by the applicant during prosecution. Moreover, Life Spine does not identify the so-called "many multiple interpretations" that it contends create ambiguity. Indeed, the only purported ambiguity raised by Life Spine is its confusion as to whether ramped portions that fit over one another are "complementary" if there is a gap. However, there is no ambiguity on this lone issue as explained above.

### F. Life Spine Mischaracterizes the Prosecution History and Law.

Life Spine contends that the Board erred by determining that the applicant specifically added the disputed claim language to exclude the mirrored ramped surfaces of Olmos. According to Life Spine, "[t]he prosecution history instead supports Life Spine's construction because it is plain that neither the examiner ***or [sic] the applicant*** considered 'complementary' to exclude ramps with mirrored angles." BB47 (emphasis added). This is a mischaracterization, as the applicant explicitly stated it did ***not*** agree that Olmos's mirrored ramped surfaces were "complementary with one another" and the applicant never acquiesced to the Examiner's unreasonably broad interpretation.

1. *Life Spine mischaracterizes the amendments and arguments made to distinguish from Olmos's mirrored ramped surfaces.*

Life Spine argues that when Globus amended claim 10 to include the "complementary with one another limitation" and identified the Figure 40 embodiment, Globus was ***not*** referring to the complementary side ramped portions

of that figure but rather was referring to the mirrored ramped portions (e.g., like the ramps of Olmos). BB48 (arguing that "this conclusion does not comport with . . . the applicant's identification of Figure 40 as embodying the 'complementary' limitation—which as discussed above, has ramped portions with mirrored angles."). This argument is forfeited on appeal, because Life Spine never raised it before the Board. *See Netflix, Inc.*, 84 F.4th at 1378. Indeed, at no point before the Board did Life Spine dispute that the "complementary" limitation was added to distinguish from Olmos's mirrored ramps and instead claim the side ramps of Figure 40 that complete one another.

Even if this new interpretation of the prosecution history is considered, it is wrong. The Board correctly found:

> [U]pon adding the "complementary with one another" limitation to the claims, the applicant expressly stated that Olmos—which discloses only ramped surfaces having mirrored angles of inclination—does not disclose the limitation. *See* Ex. 1004 (prosecution history), 251. We agree with Patent Owner that this put skilled artisans "on notice that [Patent Owner] did not consider Olmos to disclose it."

Appx43. Globus made the claim amendment and argued over Olmos specifically to *exclude* the mirrored ramped surfaces of Olmos and instead more narrowly claim the complementary side ramped portions of Figure 40. *Supra* Section II.A.2. Indeed, if the claims were amended to encompass mirrored ramped surfaces (as Life Spine

now alleges), then Globus could not have argued that the amendment *distinguishes* from the mirrored ramps of Olmos. Consequently, Life Spine's assertion that the applicant did not "consider[] 'complementary' to exclude ramps with mirrored angles" (BB47) is false.

Tellingly, Life Spine has never offered a plausible alternative interpretation of the applicant's arguments distinguishing from Olmos, because no such alternative exists. Indeed, Life Spine conspicuously avoids discussing the specific arguments made by applicant, because they undermine its false assertion. Given that Life Spine's prosecution history theory is fundamentally premised on its mischaracterization that the applicant considered "complementary" to encompass ramps with mirrored angles, that theory fails.

2. *Life Spine improperly disregards that the Examiner's interpretation was both unreasonable and applied under a broader claim construction standard.*

Life Spine suggests that the Board should have simply ignored the applicant's express statement that Olmos does not teach "complementary" ramped portions, because the Examiner persisted in applying the disputed phrase to the prior art. BB47-48. According to Life Spine, the "Board dismissed this lengthy interaction between the examiner and applicant." BB48. This assertion, too, is false.

The Board analyzed the prosecution history in depth, agreeing with Globus that the Examiner was applying the term "complementary with one another" in a

way that was inconsistent with its ordinary meaning. Appx38-39, 41-42. In fact, the Examiner seemingly recognized that his interpretation of "complementary" as encompassing mirrored ramped surfaces was wrong, insofar as he resorted to "taking devices with ramped surfaces that have mirrored angles, disassembling them, and then reorienting the ramps to fit over one another." Appx41 (citing *e.g.*, Appx1316-18; Appx1335-36; Appx2056-57 (¶¶ 166-167)). This interpretation of the claims, which are directed toward an assembled implant whose functions is to expand, was not reasonable.

The Board agreed with Globus and Mr. Culbert that ramped portions having mirrored angles "cannot complete one another absent reorienting them in a manner inconsistent with their orientation in the assembled implant," which is "simply impractical." Appx41 (citing Appx2056 (¶ 166); Appx2066 (¶ 177)). The Board also agreed that claim 10 is directed toward an assembled, functional implant, not separate components of an implant sitting on a table. Appx78 (rejecting Life Spine's absurd theory that the prior art anticipates because it could hypothetically be disassembled to reorient the ramped surfaces to be "complementary," and agreeing with Globus that "claim 10 is directed to an assembled, functional intervertebral implant, not a system of unconnected implant components"). The Board thus correctly concluded that the Examiner was not using the term "complementary" consistent with its ordinary meaning. Appx42 ("[T]he Examiner's view that ramps

that mirror each other are 'complementary with one another,' or that can be reoriented to be 'complementary with one another,[']] at best comports with the 'broadest reasonable interpretation' standard the Examiner was required to apply, but does not comport with the Phillips claim construction standard applicable here.").

As the Board explained:

> Petitioner's argument is based on an assumption that the Examiner was using the plain and ordinary meaning of the term, but Petitioner points to no persuasive evidence of record to support that assumption. For example, aside from the Examiner's rejections, Petitioner does not point to any intrinsic or extrinsic evidence that uses the term "complementary" to encompass ramped portions having angles that mirror each other.

Appx39. Life Spine still fails to identify *any* evidence in this appeal that supports its contention that "complementary" has this unreasonably broad meaning. In contrast, the Board found that the adopted construction was supported by an abundance of objective evidence, including the specification's use of "complementary," the applicant's specific arguments to overcome Olmos based on the addition of the "complementary" language, and numerous prior art references using "complementary" consistent with its common meaning. Appx39-41.

The Board also correctly determined that "[i]n continuing to press its claim construction based on the prosecution history, Petitioner fails to address or account

for this important distinction (i.e., broadest reasonable interpretation versus *Phillips*).” Appx42. Life Spine still fails to account for this distinction on appeal, instead blaming the Board for purportedly failing to “cite to any evidence—and there exists none in the record—that a skilled artisan would consider the ‘broadest reasonable interpretation’ of the term ‘complementary’ to be any different than its scope under *Phillips*.” BB49. However, there is considerable evidence in the record (e.g., the specification, the dictionary, Olmos, Baynham etc.) demonstrating that the ordinary meaning of “complementary” refers to components that complete one another; there is simply no credible evidence to the contrary. The Board thus properly determined that there was a distinction between the plain and ordinary meaning under *Phillips* and the BRI standard applied by the Examiner. *See Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1325 (Fed. Cir. 2016) (“[T]he examiner’s finding under the broadest reasonable interpretation that the claims are not limited to ‘seek acoustic noise’ cannot be dispositive. To the extent that the district court adopted this reasoning wholesale without accounting for the differences between the broadest reasonable interpretation standard and *Phillips*, the court erred.”).[8] Indeed, had the Board adopted the Examiner’s different

[8] Note that Life Spine also cited *Convolve* for the unremarkable proposition that “the Board must pay ‘particular attention to’” the “‘examiner’s focus in allowing the claims.” BB50. Life Spine, however, did not address *Convolve*’s holding regarding the differences between the broadest reasonable interpretation and *Phillips*.

interpretation, "the Board [would have] adopted a claim construction that is erroneous even under the broadest-reasonable-interpretation standard." *Straight Path IP Grp., Inc. v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1360 (Fed. Cir. 2015).

3. *Life Spine continues to falsely assert that Globus acquiesced to the Examiner's unreasonable application of the prior art by "silence."*

Life Spine argues that the Board was required to defer to the Examiner's unsubstantiated interpretation (under a different claim construction standard), based solely on the assertion that the applicant acquiesced to that interpretation via silence. However, the Board correctly found that Life Spine "mischaracterizes the prosecution history, because the applicant was not 'silent' in response to the Examiner's mappings." Appx42. Globus specifically added the "complementary with one another" limitation to the claims and argued that Olmos—which discloses only ramped surfaces having mirrored angles of inclination—does not disclose the limitation. In so doing, Globus put skilled artisans on notice that the mirrored ramped surfaces of Olmos are not "complementary with one another." Appx43 ("We agree with Patent Owner that this put skilled artisans 'on notice that [Patent Owner] did not consider Olmos to disclose it.'") (alterations in original).

Moreover, every time the Examiner rejected claims with the "complementary" limitation based on mirrored ramped surfaces, Globus responded that it was "not ***conceding*** in this application that previously pending claims are not

patentable over the cited references" and that the amendments were "made to ***facilitate expeditious*** prosecution" and not a "disclaimer[] or disavowal[]." Appx1296; Appx1247; Appx1191; Appx1122-23 (emphases added).

Life Spine improperly disregards these responses as "boilerplate," just as it tried to improperly disregard the usage of "complementary" in the specification and the applicant's explicit statement during prosecution that Olmos's mirrored ramped surfaces are *not* "complementary with one another." BB51. However, Life Spine does not get to unilaterally decide which statements from the prosecution history are considered. Life Spine cites no precedent supporting the notion that these statements can simply be ignored because they are inconvenient to Life Spine's invalidity theory. The Board thus correctly determined that the applicant expressly stated that it did *not* consider Olmos's ramped portions to be "complementary with one another" and that the applicant did not "acquiesce" or "remain silent" in response to the Examiner's persistent rejections—which again unreasonably relied on disassembling prior art implants and re-arranging their parts. Appx42-43.

4. *Nothing in this Court's precedent supports disregarding the plain and ordinary meaning of a term for an examiner's different interpretation.*

There is an abundance of credible evidence demonstrating that the plain and ordinary meaning of "complementary" refers to parts that "complete one another." This is supported by the usage in the specification, the applicant's arguments during prosecution, the common dictionary meaning of the term, and numerous spinal

fusion implant references using that term. In stark contrast, there is no evidence supporting the broader meaning proposed by Life Spine, except for the Examiner's unsubstantiated application to the prior art (and Life Spine's expert opinion). Despite this, Life Spine asks this Court to disregard the plain and ordinary meaning based entirely on the Examiner's unreasonable application of the prior art during prosecution, despite the applicant explicitly stating it did not agree with that interpretation and that it did not acquiesce to the Examiner's interpretation. However, the Board correctly determined that there is "no precedent where a patentee was found to disclaim the plain and ordinary meaning of a claim term based on an alleged acquiescence to a broader meaning ascertained from an examiner's application of prior art to the claimed." Appx43.

Because no such precedent exists, Life Spine attempts to pigeonhole the facts here into plainly inapplicable precedent. Life Spine first quotes *TorPharm, Inc. v. Ranbaxy Pharms, Inc.*, 336 F.3d 1322, 1330 (Fed. Cir. 2003) for the proposition that "[w]hether the patentee chooses to dispute the examiner's view of matters ***is relevant to claim interpretation***." BB50 (emphasis in original). Globus does not disagree. However, it is also highly relevant that the applicant made it clear that it did ***not*** agree with the Examiner's interpretation of "complementary." It is likewise highly relevant that the applicant never withdrew this statement and repeatedly stated it was not acquiescing to the Examiner's interpretation, which was unreasonable even

under the BRI standard. As *TorPharm* states: "A patentee is not required to fight tooth and nail every possibly adverse thought an examiner commits to paper, nor to advance redundant arguments for patentability." *TorPharm*, 336 F.3d at 1330. To hold otherwise would force applicants to specifically (and continually) dispute each and every argument advanced by an examiner or risk being bound by the examiner's interpretation and application of the prior art.

Life Spine also asserts that "[t]he facts here are similar to those considered in" *Cordis Corp. v. Medtronic AVE, Inc.,* 339 F.3d 1352, 1359-60 (Fed. Cir. 2003). BB51. However, both the facts and issue in *Cordis* are fundamentally different from those present here.

In *Cordis*, the issue was whether the claim phrase "slots formed therein" should be accorded its plain and ordinary meaning, which does not limit the slots to being formed by a particular process, or whether the patentee had ***disclaimed*** that scope during prosecution to require the slots be formed by removing material from a pre-existing wall surface. *Cordis*, 339 F.3d at 1359-60. This Court found that the applicant's statements during prosecution did not amount to clear and unmistakable disclaimer of the plain and ordinary meaning. *Id*. (noting that "the patentee did not rely on the method of manufacturing as a means of distinguishing the invention from the prior art" and "did not dispute" the Examiner's application of the claim phrase consistent with its plain and ordinary meaning). The Court ultimately ruled in favor

of the patentee, reversing the district court's finding of no infringement based on the erroneous claim construction. *Id.* at 1360.

*Cordis* is wholly inapplicable to the facts and issue presented here. Unlike in *Cordis* where the issue was whether during prosecution the patentee had ***disclaimed*** the ***plain and ordinary meaning*** for a narrower meaning, Life Spine admits that Globus did not disclaim the plain and ordinary meaning.[9] BB47, n.8; *see also* Appx37, n.13 ("Petitioner does not argue that the applicant disclaimed claim scope during prosecution."). Life Spine instead argues that the plain and ordinary meaning is dictated by the Examiner's unreasonable application of prior art (despite the applicant making it clear that it did not agree or acquiesce to that application). BB49-51. Nothing in *Cordis* supports that proposition.

Moreover, all credible evidence before the Court demonstrates that the ordinary understanding of "complementary" mechanical parts is that they "complete" one another. Life Spine cites no evidence to the contrary, and its entire claim construction theory is premised on this Court elevating the Examiner's unreasonable claim interpretation above the plain and ordinary meaning, despite the absence of any redefinition or disclaimer by the applicant. However, as the Board

[9] Notably, during the IPR proceedings Life Spine took seemingly conflicting positions on its claim construction theory. Life Spine initially suggested that Globus had "disclaimed" claim scope via silence, but then admitted that Globus had not disclaimed and instead was attempting a "*post-facto* disclaimer." Appx617-18.

correctly determined even after considering *Cordis*, Petitioner "identifies no precedent where a patentee was found to disclaim the plain and ordinary meaning of a claim term based on an alleged acquiescence to a broader meaning ascertained from an examiner's application of prior art to the claimed." Appx43; Appx618 (Life Spine's Reply advancing *Cordis* as support for its claim construction).

Even if the issue in *Cordis* could be twisted to align with the issue here, the case is still readily distinguishable on the facts. In *Cordis*, there was no express, unequivocal statement by the applicant about the scope of the disputed claim phrase. 339 F.3d at 1359. In contrast, the applicant here ***expressly stated*** that it did not consider Olmos's mirrored ramped surfaces to be "complementary with one another." Appx1347. Moreover, nothing in *Cordis* indicates that the applicant stated that it was *not* acquiescing to the examiner's application of the prior art, as is the case here. Further, in *Cordis* it was not disputed that the broader construction was the plain and ordinary meaning of the disputed phrase, whereas here all of the credible evidence demonstrates that the narrower construction is the plain and ordinary meaning. Consequently, even if the issue in *Cordis* were somehow relevant, the facts here would render it inapplicable.

At best, *Cordis* stands for the unremarkable proposition that the plain and ordinary meaning applies and that disclaimer is required to depart from that meaning. Given that the plain and ordinary meaning of "complementary" does not

encompass the mirrored ramped surfaces of Olmos and that Life Spine admits that the applicant did not make a disclaimer, *Cordis* cannot salvage Life Spine's claim construction theory.

If anything, *Cordis* supports the Board's claim construction. The Court properly determined that the plain and ordinary meaning of "slots formed therein" does not require their formation by a particular process. The Court then looked to determine whether the patentee had disclaimed claim scope during prosecution. *Cordis*, 339 F.3d at 1359-60. Likewise, here the Board properly determined that the plain and ordinary meaning of ramped portions that are "complementary with one another" means that they "complete one another." The Board then looked to the prosecution history to determine whether the patentee had disclaimed claim scope. As Life Spine itself admits, there was no disclaimer. Consequently, the plain and ordinary meaning applies.

## V. CONCLUSION

For the reasons set forth above, Globus respectfully requests that this Court AFFIRM the Board's decision that Life Spine failed to demonstrate unpatentability of claims 10-14 by a preponderance of the evidence.

February 20, 2025

Respectfully submitted,

/s/ *Stephen D. Zinda*
Stephen D. Zinda
James Hall
CABELLO HALL ZINDA, PLLC
801 Travis Street, Suite 1610
Houston, TX 77002
Tel: 832-631-9990
Fax: 832-631-9991

***Counsel for Globus Medical, Inc.***

## CERTIFICATE OF COMPLIANCE

This brief complies with (1) the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,340 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. App. P. 32(b), as calculated by Microsoft® Word for Microsoft 365 and manually counting words contained in the included figures; and (2) the typeface requirements of Fed. R. App. 32(a)(5)(A) and the type style requirement of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365. The font size is 14, and the font is Times New Roman.

/s/ *Stephen D. Zinda*
Stephen D. Zinda

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the Responsive Brief of the Appellee with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 20, 2025. I certify that the participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Stephen D. Zinda*
Stephen D. Zinda